May it please the court. There we go. There we go. And I should say, and this is not going to come off of your time, I should explain how the clock works. The clock starts at either 10 minutes or 20 minutes, depending on how long you have for argument. It counts down. When it reaches zero, a little before zero, there's a yellow light. When it reaches zero, the red light comes on, and then it starts counting up. If the red light is on, and it says two minutes, that does not mean you have two minutes left. That means you used two minutes extra. Okay. Just so you know, that's how the system works. Okay. When it becomes red, if you look down, there's a trapdoor yawning beneath you. At the two and a half minute mark, the trapdoor opens. That's right. You can hear it creak. Okay. All right. Can you hear me now? Okay. Sound like the Verizon commercial. There you go. Good morning. May it please the court. I'm John Minster. I represent Michael and Patricia Exendine. They brought a section 1983 case in the district court alleging a series of causes of action. The case was dismissed on summary judgment. I'd like to reserve five minutes for rebuttal. This is a ten minute argument. Okay. We'll try and help. Okay. Thanks. I think the key in this case is that the district court, in effect, decided disputed issues of fact in favor of the defendants as to our causes of action. And for that reason, the summary judgment ruling should be reversed. And what disputed issues of fact do you have in mind? The condition of the home, whether it was in good condition or bad condition, is a disputed issue of fact. Mr. Exendine filed a certification saying the home was a comfortable place to live. The electric systems, the plumbing system, the heating systems were working. They had lived in there for several years. And a jury could find also that the purported emergency claimed by the city was not really an emergency because the city allowed the Exendines to move back into their home after this alleged eviction based on housing code violations occurred within a few days. The jurors could have found, based on Michael's testimony and Patricia's testimony, that although it may not have met up with the conditions in the Beaver Cleaver home, perhaps it was a good place to live. And of course, the evidence would also have shown, had we been allowed to go to a jury, that they lived there until the next year when they sold the property to the developer who had developed the adjoining properties in the neighborhood. I gather you contend that the city's permitting your clients to go back into the property after the indemnification agreement was signed is somehow an admission of liability or culpability on the part of the city. Is that correct? I don't think it's an admission of liability or culpability, but I do think that it's an admission that the alleged grounds for immediately evicting them without a hearing, without a court order. You said without a hearing. I mean, this was a long process. Your clients received, according to the record, repeated admonishments, requests, requests to go into the house, all of which they denied. Then they went to a hearing, got the search warrant, went in. I mean, this is just something moving above, I hope, and not a California-type phenomenon. I think we're okay here. Okay, great. In any event... If there's anything wrong, the plaintiff's bar stands ready to take care of these. We're grateful for that. In any event, my point, counsel, is simply that this seems... I did a lot of zoning before I went on the bench, and it seems to me you've got a situation here where your clients, I'm sure they're very fine people, but they took a very strong position. They don't want the city bothering them at all, even though apparently there was a wall missing, there was open wiring, all of which is pretty standard stuff in terms of safety. Finally, the city just had it. They went to the court, they got the search warrant, they went in, and after that, your clients have been in litigation since then for three years. But for the indemnification where the city was saying, look, if you're going to live there, we don't want to be sued for these safety violations, but if you'll sign this indemnification agreement, we'll let you back. This seems a pretty garden-variety, recalcitrant homeowner's situation to me. What am I missing? Well, you know, I think they do... The Eckstein-Dine family is more in the don't tread on me group of people than the let's regulate everything sector of society. That's true. But I think they tried to play by the rules. When the city contacted them about wanting to go on the property, they got a lawyer. In the record is correspondence between the lawyer and the code enforcement person. The code enforcement person chose not to talk to them about a search warrant or not to work it out to go on the property through the lawyer, but instead decided to get a search warrant. She gets a search warrant, and based on the warrant, sure, she finds what she feels are code violations. But this case is really not about that so much as the eviction. It is true that the Eckstein-Dines litigated the code violation issue, but the notices of the code violation are in the record, and you'll see that those were issued, what, ten days, two weeks after the eviction took place. And then there's a process where you go in front of the hearing examiner, and then they go under the land use... But the code also provides, does it not, in the case of safety, if the city believes there are safety issues where people's lives are in danger, that they have the right to act on an emergency basis, do they not? The city code does have that provision, but... Is that what the city acted on here? Well, the city code cannot trump the Fourth Amendment. We are arguing that under plaintiff's facts, it was in fact unreasonable to evict this family from this home. And unreasonable because the code had not been complied with, or unreasonable because the code was unreasonably protective of the safety that they were not interested in protecting to the same degree? It was unreasonable because the conditions in the home did not justify an immediate eviction without a court order or hearing. Let me make my question more precise, then. Sure. That the conditions of the home didn't satisfy the code? Is that what you're saying? No, I'm saying that the eviction was unreasonable because the conditions in the home were not such as to justify an immediate warrantless, court orderless eviction. Let me make sure that you and I are on the same page. You're not contesting that the criteria in the code for an emergency eviction were satisfied. You're saying that the code is unreasonably protective of the safety of the occupants of the building. No, we're saying that the conditions in the code were not satisfied, but even if they were also satisfied... Oh, so you contest even that the conditions of the code were satisfied? Does your client contest that the wall was not missing or that the wiring was not exposed? I didn't see that in the record. No, he's not contesting that, but he's contesting... Because I think that's enough under the code to say, listen, we've got dangerous conditions and it justifies eviction. Well, we're saying that the conditions in the building did not justify an immediate eviction and the eviction was unreasonable under the Fourth Amendment. Right, so let me get back to my question then. I think we're back to the position saying that your client isn't contesting that the conditions in the code for eviction were satisfied because you're now saying, well, no, there really was a missing wall, there really was exposed wiring. You're saying that the code is unconstitutional because it protects safety to a too high degree. I think that's your argument, or am I missing something? You know, we did not challenge the constitutionality of the code in the court below. We challenged the eviction as not complying with the reasonable standards in the Fourth Amendment. We argued that it was unreasonable under the Fourth Amendment to throw this family out on the street based on the conditions of the home. And there was not extensive briefing. You know, I grant you the district court relied very heavily on the code saying, well, there's this code and it says you can throw people out on the street without a court order or a hearing. And I agree with the district court that the Sammamish Code says that. But you can have a code that says, a city code that says you can search homes without a search warrant. But that would not mean, and if the police comply with that, that would not mean that the search was reasonable under the Fourth Amendment. So this is a fact-specific case rather than a blunderbuss challenge to the Sammamish City Code. We're not trying to accomplish that. We're saying that these people should not have been thrown out on the street under these facts, under plaintiff's facts, and that we should be allowed to present that to a jury. We have failed in our duty to protect your reserve time. You've got 30 seconds. Let's hear from the other side, and we'll give you a little more than 30 seconds to respond. Well, I don't mind. I always welcome the excellent questions that I always get in the Ninth Circuit. Okay. Thank you. Let's hear from the other side, and then we'll give you a chance to respond. Good morning. Richard Jolly for Appellees. We'd like to begin by pointing out for the Court that there really is no disputed question of fact, that according to the record that's before the Court here, Mr. Exendine's declaration doesn't dispute that there's exposed wiring, holes in the floor, dry rot under the eaves and on the roof. Rather, the declaration is carefully He does seem to dispute whether or not there's hot and cold running water. Your Honor, actually, the record indicates that he says that there was running water. He doesn't say that there was hot and cold running water, if I'm not mistaken. And according to the Code, there's supposed to be both hot and cold running water. And I think that Mr. Exendine is merely submitting that there was running water there in the house. But as I read sort of the write-up after entry into the house by the city officials, they say no, there's a lack of hot and cold running water. So there's some dispute. And assuming for argument's sake that Mr. Exendine is submitting that there is hot and cold running water, he's still not disputing that there's exposed wiring, that there's dry rot, that there's holes in the floor, other significant safety concerns that would justify the actions of the city, pursuant not only to the Uniform Building Code that the city adopted, but also state statute RCW 35.80.030, which gives the city authority to abate nuisances immediately. Any one of these violations under the Code would have been sufficient to abate the nuisance, right? You don't have to have all of them. In other words, say hypothetically there were hot and cold running water, but there was a missing wall and there were the other allegations of a Code violation. Any one of the others would have been sufficient to result in this emergency eviction, under the Code anyway, right? That would certainly be Apelli's position as far as how that should be interpreted. And here, Mr. Minster graciously concedes that they're not challenging the validity of the statutes that permitted the Code enforcement officer to take action. And so we would submit that there really is no question of fact to be determined based on the record that's before the court. The generalities that Apelli's offer about the house being comfortable, that's not really at issue. That's rather subjective. But the cold, hard facts in the record are that the city was justified to take action pursuant to the Uniform Building Code. And we would agree with Apelli's that the broad proposition we would agree with. Are they the Apelli's or are you the Apelli's? They're the Apelli's. I'm going to say we've got switched parties here. I'd rather refer to us as the city. You'd rather be the Apelli's, wouldn't you? You can refer to yourself as the city if you'd like. I would prefer that. Why don't you call yourself whatever you want. Okay. The city agrees with Mr. Exendyne that the broad proposition, or for the broad proposition, that you can have a Fourth Amendment violation if there's an eviction without prior notice. But the broad proposition is not what is at issue here. There was a long-running relationship between the city and Mr. Exendyne. And the city had authority to go onto the property. The validity of the warrant is not disputed. And the case law that was submitted in plaintiff's briefing can certainly be distinguished from the facts here. And forgive me if I'm pronouncing this wrong, but I believe it's Armendariz v. Penman is a case that plaintiffs cited to hear from the Ninth Circuit that establishes that you can have a Fourth Amendment violation based on some sort of eviction or action by a building official. But there, the facts are so distinguishable from what happened here, we would submit that the holding there isn't applicable, at least to create a question of fact here. There was a search warrant here. And the city people went in, executed the search warrant. And they found what they determined to be emergency conditions of the exposed wire and all that. And so at that point, they just said, you know, you're going to have to leave. Period. Go. And the Exendyne family had to leave. Then the family was provided with a post-deprivation, if you will, proceeding. And I suppose during that proceeding, they heard the grievances that they had. Now, do you see a Fourth Amendment violation anywhere in that process?  We would submit that the distinguishing facts between this case and the Penman case are that the day that the notice to vacate was issued, you'll see in the record at Excerpt of Record 76, the notice to comply states what the violations are. It says illegal occupancy of a garage. And that's, in essence, what was going on here. The Exendynes were living in a garage. And that's what created the problems with the exposed wiring, the lack of a sufficient wall, the holes in the floor, et cetera. And in Penman, my understanding of the facts based on the opinion issued by the court is that sometimes there was a six-week lag between the notice to vacate and what the actual violations were. And also in Penman, I believe there was a question of fact as to whether or not the building authorities were acting under pretext, merely because they're trying to clean up this area. I think it was in San Bernardino, problems with drug dealers and that sort of thing. And there's nothing in the record here that would suggest that the city was acting on a pretext and had some underlying evil motives. And so we would say that that distinguishes those here. What we do agree with about Penman is the idea that there's not a substantive due process violation here. Penman sets forth that when there are more specific constitutional avenues that can be pursued, here we would submit Fourth and Fifth Amendment violations, that the substantive due process sort of generic claim that's being made by Mr. Exendyne was appropriately dismissed by the district court. As a matter of fact, in Penman, as I recall, there were fake housing violations and then they failed to inform the occupants of the property why they were being evicted. In this case, you've got a long – you've got a search warrant where they went in, checked things, observed them. There had been a long communication and discussion about what would happen if the Exendynes did not comply with the code. So the Fourth Amendment and due process issues somewhat intertwine here. And am I missing something? That there was plenty of notice in this case all along. These folks were aware that the city was trying to get these codes cleaned up – code violations cleaned up, rather. They gave them lots of notice. They gave them lots of opportunities even after the eviction. And moreover, they let them go back based upon the indemnification agreement, which they were not required to do. They could have required them to stay outside the property until the code violations were cleaned up. Isn't that correct? That is correct, Your Honor. And we would submit that the existence of the indemnity agreement is not some sort of admission of wrongdoing by the city. Let me ask you about that. And that's the one part of this case that gives me pause. The articulated ground for getting the Exendynes out of the property was a threat to safety, maybe even to life. Yet the city is quite willing to let them back in with the conditions inside of the house unchanged. The only thing that they now insist on is an indemnification agreement. Well, actions speak louder than words. It sounds as though the only thing the city considered to be an emergency was the possibility of suit against the city. And once that's taken away from them by a signed agreement, they're quite willing to let the Exendynes go back into what previously had been characterized as a threat to their lives and safety. What's going on here? Well, the existence of the indemnity agreement doesn't alter the fact that there was exposed wiring. I understand that. But it does tell us that the city does not think that it's such an imminent threat to life and safety of the occupants that they won't let them in there. The only thing it tells us is, and it tells it to us loud and clear, that the city was concerned first and foremost about a suit against the city. And once that problem is off the table, back in they go with the city's blessing. Your Honor, I don't know if the city would agree with Mr. Exendynes' contention that the standards set forth in the code for the eviction notice had to be an immediate threat to life or safety. I think there's a distinction between an emergency or having to act quickly and an immediate threat to life or safety. I really think that must be your argument instead of the argument that the city likes to make, which is to say a threat to life and safety of the Exendynes. Rather, the argument is violation of the code gives us the power under the code to evict you until things are worked out to our satisfaction. Because I think the city has made it very clear that they don't actually think that the conditions inside that house at that time were such a severe threat to their life and safety because back in they go and the city says, fine, so long as we don't get sued, we don't care. Okay. Thank you. You've saved with our rather inadequate assistant 30 seconds, so why don't we give you a minute and 30 seconds and then see where we are. Thank you very much. Well, Judge Fletcher, I think the point that you just made about the indemnification illustrates that there is a question of fact as to whether really there were emergency conditions. But here's my question, because it's the flip side of the coin. Is the only constitutional basis for the eviction that might be available, is actual imminent threat to safety and health, or is it permissible under the Constitution to evict when there are serious code violations? Now they're going to be contested, these are serious code violations, until things can be worked out. I think in this case, whether there were serious code violations, whether there was an emergency situation in the home was an issue of fact for the jury to decide. And the fact that, as you pointed out, the city was willing to let the Exodyne family come in within a matter of just a few days and live in the house, and live there they did until they sold the house the next year, sheds light on whether in fact the eviction was reasonable or unreasonable under the Fourth Amendment. Two other quick points. The search warrant did not authorize the eviction. There was no reference to the eviction in the search warrant. Secondly, in response to Judge Smith's comments, excuse me, Judge Thompson's comments, there was no ongoing discussion or threat by the city to the Exodynes that they would be evicted if they did not remedy the code violations. There was dialogue between the city and the Exodynes and then between the city and their lawyer about the need to remedy code violations if they were found. But there was no threat, nothing was said about an eviction until the day the family was thrown out of the house. In other words, there was in fact no discussion about what would happen. The thrust of this lawsuit is about the eviction. Finally, there was no post-deprivation proceeding regarding the eviction. There is a state law procedure for litigating whether or not there are code violations under the Land Use Protection Act, or LUPA as it's called in Washington. You can litigate whether there were code violations or not, and the Exodynes went through that process. But at no time in that litigation was the legality of the eviction litigated. Thank you very much for your attention. Thank you both sides for your helpful argument. The case of Exodyne v. City of Sammamish is now submitted for decision. The next case on the argument calendar is Quiznet v. United States, and I apologize if I mispronounced the name.
judges: Thompson, Fletcher, Smith